FILED
CLERK
11/5/2026
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------X

LINDEL BUGGS,

*Plaintiff,*

-against-

THE UNITED STATES OF AMERICA,

*Defendant.*

---------------------------------------------X

**OPINION AND ORDER**

23-cv-7130 (JMW)

**A P P E A R A N C E S:**

Jennifer Ann Spellman
**Law Office of Kujawski & Kujawski**
Deer Park Avenue
Deer Park, NY 11729

Melissa B. Pittelli
Steven B. Ferber
**Davis & Ferber, LLP**
1345 Motor Parkway
Islandia, NY 11749

Brian Michael Dratch
**The Dratch Law Firm, P.C.**
354 Eisenhower Parkway
Livingston, NJ 07039
*Attorneys for Plaintiffs*

Alina Austin
**DOJ-USAO, Civil Division**
610 Federal Plaza, 5th Floor
Central Islip, NY 11722
*Attorney for Defendant*

**WICKS**, Magistrate Judge:

Plaintiff Lindel Buggs brings this action under the Federal Tort Claims Act ("FTCA") against Defendant United States of America seeking damages for bodily injuries sustained in a car crash between Plaintiff and a driver employed by Defendant. Presently before the Court are Defendant's motion for summary judgment (ECF No. 43) and Plaintiff's motion for partial summary judgment (ECF No. 42). The Court finds that Plaintiff is entitled to summary judgment on the element of liability. Ultimately, however, Plaintiff fails to raise a triable issue of fact as to causation. Because causation is a necessary element of his cause of action, the Court grants Defendant's motion for summary judgment dismissing the Complaint in its entirety.

## PLAINTIFF'S PARTIAL MOTION ON LIABILITY

### I. Facts Related to Liability

The facts below are drawn from Defendant's combined Rule 56.1 statement, which includes Plaintiff's responses (ECF No. 53-1), and from the underlying record where Plaintiff disputes a fact or the statements are silent. Unless otherwise noted, the facts are undisputed.[1]

On or about August 29, 2022, at approximately 8:53 p.m., Plaintiff Lindel Buggs was involved in a motor vehicle accident with Department of Homeland Security Special Agent Deighton Hobbs. (ECF No. 49 at ¶ 15.)[2] At the time of the subject accident, Hobbs was the operator of a motor vehicle owned by Defendant the United States of America. (*Id.* at ¶¶ 16-17.)

[1] Defendant's original Rule 56.1 statement (ECF No. 45), Plaintiff's responses (ECF No. 47-3), and Defendant's replies are reproduced in Defendant's combined statement (ECF No. 53-1), which also contains Defendant's responses to the additional facts in Plaintiff's counsel's affirmation (ECF No. 47-1). "Def.'s 56.1 Stmt." refers to the paragraphs of Defendant's statement; "Pl.'s 56.1 Resp." refers to Plaintiff's response to the same paragraph; and "Pl.'s Add'l Facts" refers to the affirmation's paragraphs. The circumstances of the collision and liability are the subject of Plaintiff's separate motion and are addressed here only for context.

[2] Throughout Plaintiff's statement of facts, he refers to Hobbs as a Defendant, and in each instance, Defendant denies that "Hobbs is a defendant as the United States of America is the only proper defendant

Plaintiff asserts that "[j]ust prior to the accident, Plaintiff Lindel Buggs had been traveling southbound on William Floyd Parkway, and Defendant Deighton Hobbs had been traveling westbound on Longwood Road." (*Id.* at ¶ 19.) Defendant denies that Hobbs was traveling westbound on William Floyd Parkway and asserts that he "was traveling northbound on William Floyd Parkway and turned left onto Longwood Road." (*Id.*) Regardless, the intersection of William Floyd Parkway and Longwood Road was controlled by a traffic light on the day of the accident. (*Id.* at ¶ 20.)

Before the impact, Plaintiff was traveling at 55-mph on cruise control with his foot off the gas pedal, flat on the floor, and "just relaxing," in Plaintiff's own words. (ECF No. 42-7 at 24:20–25:7, 49:15–21.)

Both parties agree that the light was green for Plaintiff "when he was approaching the intersection." (*Id.* at ¶ 21.) Plaintiff further contends that the light "remained a steady green light as Plaintiff entered the intersection." (*Id.*) This is based on Plaintiff's testimony. (*See id.*) Defendant denies that the light remained green as Plaintiff entered the intersection. (*Id.*) Defendant does not cite any affirmative evidence to rebut Plaintiff's testimony; the basis for Defendant's denial is that Special Agent Hobbs testified that he could not remember the color of the light prior to impact. (*Id.*)

At impact, Plaintiff's vehicle hit the government vehicle on the passenger side, in what Defendant characterizes as a "T-bone collision." (ECF No. 47-3 at ¶ 46; ECF No. 49, Defs' Add'l Facts ¶ 5.)

---

pursuant to Federal Tort Claims Act 28 U.S.C. §§ 2679(a) and 1346(b) and was, therefore, dismissed from this action by way of Stipulation and Order Modifying Parties and Caption dated November 8, 2023." (*Id.* at ¶¶ 16-17, 19, 23-24.)

Plaintiff's non-party witness, Susan Winslow testified that she "had been traveling directly behind Plaintiff on William Floyd Parkway just prior to the accident." (ECF No. 49 at ¶ 23.) Winslow testified that the light was green "at the time of the accident," and that the government car "r[a]n the red light." (ECF No. 42-9 at 12:5–12, 15:7–10; *see also id.* at 45:8–22, 48:4–8.) Again, Defendant denies that the light remained green but does not cite any affirmative evidence contrary to Winslow's testimony; Defendant simply notes that Plaintiff testified the light was green as he was *approaching* the intersection, as if that somehow contradicts Winslow's testimony that it also remained green as he *entered* the intersection. (ECF No. 49 at ¶ 23.)

Winslow further testified that she observed Plaintiff's vehicle enter the intersection first before it was struck by Special Agent Hobbs' vehicle. (*Id.*) Defendant denies "that Plaintiff's vehicle entered the intersection first," since "Plaintiff testified he did not notice SA Hobbs' vehicle before the impact." (*Id.*)

Defendant makes conflicting assertions as to whether Winslow physically assisted Plaintiff after the accident, first asserting that "assisted Plaintiff in crawling away from his vehicle," then asserting "Winslow did not physically assist Plaintiff after the accident." (*See id.*, Def.'s Add'l Facts at ¶¶ 6, 11.) Defendant asserts that Plaintiff "walked out of his car and walked over." (*Id.* at ¶ 12.)

Special Agent Hobbs testified that he could not recall what the color of the light was for vehicles traveling westbound on Longwood Road at the time of the accident. (*Id.* at ¶ 24.) Defendant asserts that Special Agent Hobbs "lost memory from the impact." (*Id.*, Def.'s Add'l Facts ¶ 7.) Defendant asserts that "Plaintiff did not see the color of the traffic light at the intersection of William Floyd Parkway and Longwood Road that was facing the direction SA

Hobbs was traveling[.]" (*Id.* at ¶ 1.) Both parties agree that Special Agent Hobbs "never saw Plaintiff's vehicle prior to the accident." (*Id.* at ¶ 24.) Defendant asserts that "[o]n September 12, 2022, SA Hobbs reported that he 'recalls being stopped at a light on Longwood Rd waiting to cross William Floyd Parkway heading in the westerly direction.'" (*Id.* at ¶ 8.)

## I. The Legal Framework

On a summary judgment motion, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the burden shifts and the nonmovant may defeat the motion only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002). The burden on summary judgment is considered a procedural issue and therefore the Federal Rules apply. Thus, unlike state court where the burden is on the movant, "Defendant need not make any affirmative *prima facie* showing on this motion for summary judgment, and may discharge its burden of proof merely 'by pointing to an absence of evidence to support an essential element of [Plaintiff's] claim.'" *Vasquez v. United States*, No. 14-CV-1510 (DF), 2016 WL 315879, at *5 (S.D.N.Y. Jan. 15, 2016) (internal citations omitted) (emphasis in original).

"The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts." *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted). The role of the court at the summary judgment phase is not to *resolve* disputed issues of fact but only undertake an analysis to *identify* whether triable issues of fact exist. *See Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021). That is, the court's function is "issue-finding," not "issue-resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)). Au fond, the court's role is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing *Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

## II. Discussion

"In New York, the Vehicle and Traffic Law ('VTL') defines the duties of motorists, and a violation of the VTL constitutes negligence as a matter of law." *Dooley v. United States*, 83 F.4th 156, 163 (2d Cir. 2023) (citation modified; internal citation omitted). The VTL provides that traffic must stop at a red light. VTL § 1111(d)(1). Ergo, "if a driver runs a red light, that party is per se negligent." *Sterling v. United States*, No. 23-CV-4830 (RER) (LB), 2025 WL 2772853, at *5 (E.D.N.Y. Sept. 29, 2025).

Both Plaintiff and non-party witness Susan Winslow testified that the light remained

green as Plaintiff entered the intersection, and Special Agent Hobbs ran the red light. Defendant cites no testimony or other evidence to the contrary.[3]

Nevertheless, Defendant makes several arguments against finding that Special Agent Hobbs ran the red light. First, Defendant asserts that neither Plaintiff nor Ms. Winslow could attest that Special Agent Hobbs did not have the green light as he approached the intersection, as Plaintiff admitted he could not see the color of the light facing Special Agent Hobbs. (ECF No. 48 at 6–7.) This argument is spurious. Of course, Plaintiff could not see the light facing Special Agent Hobbs—it was perpendicular to Plaintiff and therefore out of his line of sight. What matters is that the light facing Plaintiff was green. If the light facing Plaintiff was green, then necessarily the perpendicular light facing Special Agent Hobbs was red.

Next, Defendant notes that although Special Agent Hobbs could not recall what color the light was when he was deposed in May 2024, he made a different statement just two weeks after the Accident. (ECF No. 48 at 7.) Specifically, the accident report dated September 13, 2022 states that "SA Hobbs recalls being stopped at a light on Longwood Rd waiting to cross William Floyd Parkway heading in a westerly direction. There was then a moment of unaccounted memory. As SA Hobbs started to become more aware of his situation, he realized the car was severely damages and still moving." (ECF No. 50-2 at 3.) But Defendant does not explain how this report is inconsistent with the testimony that Special Agent Hobbs ran the red light. By his own admission he cannot recall how or when he got from being "stopped at a light . . . waiting to cross" to being in the middle of the intersection.

[3] Defendant also argues that the credibility of Plaintiff and Ms. Winslow is questionable because they made certain mistakes in their testimony. But on the question of who had the green light, both were unequivocal and uncontroverted.

Finally, Defendant points to the police report dated October 4, 2022, which states that "both operators stated they had a green light." (ECF No. 48 at 7 (citing ECF No. 42-6).) However, this statement is hearsay. "[T]o the extent any police report contains third-party statements or statements not based on the officer's personal knowledge, such material is hearsay, and an independent evidentiary basis is required for admitting these statements." *D.R. by Rodriguez v. Santos Bakery, Inc.*, 675 F. Supp. 3d 355, 360 (S.D.N.Y. 2023) (excluding statements in police report which were based on the defendant's "self-serving out-of-court statements rather than the police officer's personal knowledge"); *accord Labacz v. Rohr*, No. 19-CV-528 (DLI)(RML), 2023 WL 6216214, at *1 (E.D.N.Y. Sept. 23, 2023); *Reynoso v. Levine*, No. 19 CIV. 151 (LGS), 2021 WL 6054672, at *1 n.1 (S.D.N.Y. July 27, 2021); *Desrameaux v. Delta Air Lines Inc.*, No. 215CV347CBAVMS, 2018 WL 1224100, at *4 n.9 (E.D.N.Y. Mar. 8, 2018); *Petschauer v. United States*, No. 13CV6335NGGVMS, 2016 WL 1271035, at *4 (E.D.N.Y. Mar. 29, 2016); *see also Astorga v. Allstate Oil Recovery, Co.*, No. 16-CV-05068 (SN), 2018 WL 1441377, at *2 (S.D.N.Y. Mar. 22, 2018) (granting summary judgment to the plaintiff on liability where the defendant's only evidence was the police report's summary of the defendant's description of the accident, which is inadmissible hearsay).[4]

In the alternative, Defendant argues that even if Special Agent Hobbs did run the red light, Plaintiff's motion on liability should still be denied, because Plaintiff was comparatively negligent. Plaintiff admits that before the accident he was traveling at 55-mph on cruise control with his foot off the gas pedal, flat on the floor, "just relaxing." (ECF No. 42-7 at 24:20–25:7,

[4] At oral argument, defense counsel suggested that the statements in the police report could fall under the "present sense impression" exception to hearsay. But that exception applies only to statements made "while or immediately after" the declarant perceived the event. Fed. R. Evid. 803(1). Hence, courts routinely find that statements recorded in police reports—which are compiled some time after the incident—are inadmissible hearsay, as per the case collected above.

49:15–21.) Moreover, Plaintiff hit Special Agent Hobbs along the side of Special Agent Hobbs' car, which means Special Agent Hobbs was in the intersection before Plaintiff, yet Plaintiff did not try to swerve out of the way. (*See* ECF No. 42-7 at 30, 34.) Under pre-2018 caselaw, those facts may have been enough to deny Plaintiff's motion. *See Valiando v. Catalfamo*, 29 N.Y.S.3d 685, 687-88 (3d Dep't 2016) (denying plaintiff's motion for summary judgment on liability, despite finding that plaintiff had the right of way, because it was unclear whether plaintiff approached the intersection with caution). However, in 2018 the New York Court of Appeals clarified that a plaintiff does not need to establish the absence of his own comparative negligence in order to be entitled to partial summary judgment on the issue of a defendant's liability. *Rodriguez v. City of New York*, 101 N.E.3d 366, 367 (N.Y. 2018). Following *Rodriquez*, courts have uniformly acknowledged that "summary judgment as to liability is warranted so long as the plaintiff establishes the defendant's negligence as a matter of law, irrespective of whether the defendant raises issues of fact regarding the plaintiff's comparative fault." *Joseph v. STMR Inc.*, No. 19CV125ENVRER, 2022 WL 5173669, at *10 (E.D.N.Y. Aug. 24, 2022); *accord Ordonez v. Troiano*, No. 17-CV-5011(EK)(RML), 2022 WL 595157, at *3 (E.D.N.Y. Feb. 28, 2022); *Heller v. Zumba*, No. 17 CIV. 598 (PAC), 2018 WL 1737234, at *2 (S.D.N.Y. Apr. 9, 2018).

Accordingly, the Court finds that Plaintiff is entitled to summary judgment on the issue of liability. *See Robinson v. City of New York*, 111 N.Y.S.3d 866, 867 (2d Dep't 2019) (granting plaintiff's motion for summary judgment where defendant ran the red light). Defendant has not come forward with sufficient evidence to negate the finding that Hobbs proceeded through the red light. There is no triable issue of fact on liability, even if the issue of apportionment remains open.

But that's not all. Liability alone does not carry the day for Plaintiff. Causation is the next hurdle.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. Facts Related to Causation

Plaintiff first injured his lower back in August 2007 during an arrest in which he alleged that police used excessive force. (Def.'s 56.1 Stmt. ¶¶ 4-5.) Plaintiff was incarcerated from then until January 2020. (*Id.* ¶ 6.) Dr. John Galeno, an orthopedic surgeon, began treating him no later than January 2017, at a prison medical unit, when an MRI showed disc degeneration from L4 to S1 with nerve root compression. (*Id.* ¶ 97; ECF No. 46-5 ("Galeno Tr.") at 22:17–23:17.) Dr. Galeno diagnosed a herniated lumbar disc, radiculopathy, lumbar spondylosis, spinal stenosis, and degenerative disc disease. (Def.'s 56.1 Stmt. ¶ 8.) On October 20, 2017, Dr. Galeno performed Plaintiff's first lumbar surgery, a laminectomy and fusion at L4–S1 using pedicle screws. (*Id.* ¶¶ 9, 99, 101-02, 107.) On October 16, 2018, Plaintiff fell from a top bunk in prison and injured his back. (*Id.* ¶ 10.) A lumbar CT the next day reportedly showed the hardware in good position. (ECF No. 46-15 ("Fischer Rpt.") at 21.)

After his release, Plaintiff returned to Dr. Galeno in August 2020 with chronic back pain radiating to both lower extremities, which by September kept him in bed most days. (Def.'s 56.1 Stmt. ¶¶ 12–14.) On September 30, 2020, Dr. Galeno performed a second surgery to repair a nonunion of the 2017 fusion, which had loosened the hardware, and extended the fusion up to L2 to address new herniations at L2-L3 and L3-L4. (*Id.* ¶¶ 15–16, 104, 109.) Dr. Galeno explained that a nonunion occurs when a fusion fails to solidify, which may loosen the hardware and require another operation. (*Id.* ¶ 105.) This may result from circulation problems, nicotine use, trauma,

or no definitive reason. (*Id.* ¶¶ 106.) Trauma can also loosen hardware that had already united. (Galeno Tr. at 35:3–12.)

On July 2, 2021, Plaintiff fell in the shower and went to the emergency room with low back and neck pain. (Def.'s 56.1 Stmt. ¶ 25.) A lumbar CT showed "possible pedicular screw loosening at the L2 level bilaterally," which Dr. Galeno read as "a halo around the L2 screws at the top of the construct." (*Id.* ¶¶ 26–27.) On September 8, 2021, Dr. Galeno performed a third surgery, that included a second repair of the nonunion and extending the instrumentation up to T12. (*Id.* ¶¶ 28, 110.) He testified that this loosening resulted from the nonunion but "could also be coming from a trauma," and that there is no way to know definitively. (*Id.* ¶ 111; Galeno Tr. at 42:2–21.) He did not consider Plaintiff "prone to nonunions" and did not expect another one. (Galeno Tr. at 45:12–20.)

Plaintiff's neck complaints began in March 2021, when he told Dr. Galeno of neck pain radiating to his right upper extremity. (Def.'s 56.1 Stmt. ¶ 18.) An April 2, 2021 cervical MRI showed degenerative change at every level from C2 to T1, including minimal bulges at C2-3 and C3-4, foraminal compromise and nerve root impingement from C4-5 through C7-T1, and mild spinal stenosis. (*Id.* ¶ 19.) On April 28, 2021, Plaintiff had a consultation with Dr. Timothy Groth, a pain management physician, for chronic low back and neck pain "in the context of a motor vehicle accident where the patient was Tboned" and Plaintiff requested to have a surgical consult. (*Id.* ¶ 20; ECF No. 46-10 ("Groth Tr.") at 41:22–42:7.) Dr. Groth found clinical signs of cervical radiculopathy, though a May 2021 EMG showed none. (Def.'s 56.1 Stmt. ¶¶ 21, 151–52.) In June 2021, Plaintiff continued to report disabling neck pain and total disability. (*Id.* ¶¶ 22–24.) The cervical CT from the July 2, 2021 emergency room visit was read as normal, but Defendant's

expert found loss of disc height, osteophytes, and foraminal stenosis at C5-6 and C6-7 which they opined to show "pre-existing degeneration." (Fischer Rpt. at 24–26; Def.'s 56.1 Stmt. ¶ 185.)

Dr. Groth personally consulted with Plaintiff monthly from April through December 2021, when, following the third lumbar surgery, he considered Plaintiff totally disabled with pain of 10 out of 10. (Def.'s 56.1 Stmt. ¶¶ 155, 162; Groth Tr. at 65:6–66:3.) In the months before the accident, Dr. Groth and Plaintiff discussed moving toward neck surgery. (Groth Tr. at 96:12-19.) On June 23, 2022, Dr. Galeno noted decreased range of motion and pain on range of motion in the neck and back, diagnosed cervical and lumbar radiculopathy, and "discussed the option of surgery." (Def.'s 56.1 Stmt. ¶ 117; ECF No. 46-5 at 118.) On August 8, 2022, three weeks before the accident, Plaintiff reported neck and back pain of 7 to 9 out of 10 at Dr. Groth's office and said he was considering cervical surgery but wanted to wait until he had been at his job longer. (Def.'s 56.1 Stmt. ¶¶ 29, 175; Def.'s Resp. to Pl.'s Add'l Facts ¶ 13.) Dr. Galeno was considering surgery because Plaintiff had "not responded to conservative management" and Plaintiff's pain was worsening. (Def.'s 56.1 Stmt. ¶ 125.)

On the evening of August 29, 2022, Plaintiff's car, traveling at about 55 miles per hour, struck the passenger side of a government vehicle. (Def.'s 56.1 Stmt. ¶¶ 30, 35, 46.) All his airbags deployed and the car was totaled. (*Id.* ¶¶ 48, 56.) Plaintiff claims that the accident caused (1) loosening of the T12 and L1 pedicle screws, requiring the February 1, 2023 lumbar revision, and (2) an exacerbation of a cervical herniation, requiring the September 7, 2022 cervical fusion. (*Id.* ¶ 57.)

At the hospital that night, Plaintiff had no neck or back tenderness. (*Id.* ¶ 60.) The lumbar CT showed "[l]ucency around the screws bilaterally at T12 and on the right at L1. No fracture. No traumatic subluxation," with an impression of "loosening around the pedicle screws." (*Id.* ¶ 62;

Pl.'s 56.1 Resp. ¶ 62.) The thoracic CT likewise showed lucency around the lower screws with no fracture. (Def.'s 56.1 Stmt. ¶ 63.) The cervical CT showed moderate degenerative disc disease at C5-C6 and multilevel facet arthropathy, but no fracture and normal alignment. (*Id.* ¶ 64.) The orthopedist found "[n]o acute injury seen on CT," and Plaintiff was discharged about five hours after arrival with a leg abrasion and hip pain. (*Id.* ¶¶ 65–67.)

Three days later, on September 1, 2022, Dr. Galeno noted that Plaintiff "was coming to the office to be scheduled for his cervical spine surgery and he was in a car accident," that "his back pain is worse as well as his neck pain," and that his chronic low back pain had been "becoming stable and now is much worse." (*Id.* ¶ 68; Pl.'s 56.1 Resp. ¶ 68.) He reviewed the thoracic CT showing loosening at T12 and L1 and noted decreased range of motion in the neck and back. (Def.'s 56.1 Stmt. ¶¶ 122, 124.) Dr. Galeno planned to schedule a cervical fusion at C4 through C7. (*Id.* ¶ 68.) He ordered new cervical, thoracic, and lumbar MRIs "in the meantime." (ECF No. 46-5 at 119.)

The cervical MRI, performed on September 2, reported "[m]ultilevel cervical disc pathology with progression at C3-4 and C4-5 since the prior study of April 2021," with broad-based herniations from C3-4 through C7-T1, several with annular tears. (Fischer Rpt. at 22.) The thoracic MRI showed herniations from T4-5 through T9-10. (*Id.*; Def.'s 56.1 Stmt. ¶ 190.) Neither party's Rule 56.1 statement describes the September 2, 2022 MRIs further. That same day, Plaintiff had his first post-accident visit to Dr. Groth's practice, with a nurse practitioner. (Groth Tr. at 51:15–24.) On September 7, 2022, Dr. Galeno performed the cervical fusion; the pre-operative diagnoses were disc herniation, degenerative disc disease, stenosis, and nerve root and spinal cord compression. (Def.'s 56.1 Stmt. ¶¶ 69, 127–28.)

On October 13, 2022, Dr. Galeno wrote that the "hardware loosening in the thoracolumbar region . . . was causing significant low back pain, which was accentuated by the motor vehicle accident." (ECF No. 46-13 ("Galeno Rpt.") at 2.) A November 4, 2022 CT again showed lucency at T12 and L1, which Dr. Galeno read as reflecting "a nonunion of the spine fusion at the top of the construct." (Fischer Rpt. at 22; Galeno Rpt. at 2.) On February 1, 2023, Dr. Galeno performed Plaintiff's fourth lumbar surgery, and third nonunion repair, re-instrumenting from T10 to S1. (Def.'s 56.1 Stmt. ¶¶ 70, 130.) On April 11, 2023, Plaintiff told Dr. Galeno of a "recent motor vehicle accident where he was a driver of the vehicle when a car backed into him." (*Id.* ¶ 71.) Dr. Groth implanted a trial spinal cord stimulator in November 2024 and a permanent one in January 2025. (*Id.* ¶¶ 72–73.)

On January 19, 2024, while working as a courier, Plaintiff slid on black ice and struck another vehicle. (*Id.* ¶ 74.) In support of Plaintiff's occupational accident claim, a chiropractor in Dr. Groth's office reported cervical and lumbar sprains requiring ninety days of disability, with his degeneration and "multiple spinal surgeries" as contributing conditions. (Def.'s 56.1 Stmt. ¶¶ 78, 81–83.) Dr. Galeno treated Plaintiff for the 2024 Accident and wrote that he "remains totally disabled," and Dr. Groth's practice treated him fourteen times in February 2024 in connection with it, which included a cervical epidural steroid injection. (*Id.* ¶¶ 79–80, 84–86.) A February 12, 2024 cervical MRI showed herniations with nerve root compression at C3-4 and C7-T1, the levels directly above and below the fusion. (*Id.* ¶ 87.) Plaintiff complained of pain in the same areas after both accidents. (*Id.* ¶ 158.)

Dr. Galeno has treated Plaintiff since at least 2017, seeing him "every couple of months." (*Id.* ¶ 97; Galeno Tr. at 20:2–8.) Dr. Galeno has never met Dr. Groth and did not review his medical records in-depth. (Galeno Tr. at 69:13–22.) He does not record pain levels, which he

regards as meaningless and he assesses range of motion by sight, considering measurement "very subjective" and "useless," though he will note when it is "markedly decreased from before." (Def.'s 56.1 Stmt. ¶¶ 112, 115–16; Pl.'s 56.1 Resp. ¶ 116.) He did not know Plaintiff's level of disability at any given time. (Def.'s 56.1 Stmt. ¶ 114.)

As to the September 1, 2022 visit, Dr. Galeno relied on Plaintiff's report that his pain was worse because of the 2022 Accident. (*Id.* ¶ 121.) Plaintiff notes that Dr. Galeno also found decreased range of motion. (Pl.'s 56.1 Resp. ¶ 121.) Dr. Galeno testified that "I didn't compare the previous exam pre-accident to this exam and say that his range of motion is worse. I just said that it's decreased." (Galeno Tr. at 58:10–15; Def.'s 56.1 Stmt. ¶¶ 122–23.) Outside of Plaintiff's subjective reports, Dr. Galeno has no way to measure how much worse Plaintiff's pain became. (Def.'s 56.1 Stmt. ¶ 126.) He testified that the September 1 plan meant that "as a result of the accident, the pain became significantly worse and now we have to expedite scheduling the surgery," and, when pressed, that the decision rested on "a combination" of Plaintiff's pre-accident failure to respond to conservative treatment and post-accident worsening. (Galeno Tr. at 60:8–62:11.)

Dr. Galeno testified that the accident "may have made the herniated disc bigger and worse," but when asked whether he could say so definitively, he answered "Correct," and that "I could tell you it made the pain worse, made it more symptomatic. I can't tell you size wise." (Galeno Tr. at 63:19–64:12; Def.'s 56.1 Stmt. ¶¶ 128–29; Pl.'s 56.1 Resp. ¶¶ 128–29.)[5] As to the lumbar screws, he first testified that the post-accident loosening "could have been from the accident and it could have been another nonunion," with no way to tell. (Galeno Tr. at 58:16–59:5; Def.'s 56.1

[5] Defendant characterizes this testimony as an admission that Dr. Galeno "cannot definitively say" the herniations were exacerbated; Plaintiff characterizes it as testimony that the accident made the pain worse. (Def.'s 56.1 Stmt. ¶ 129; Pl.'s 56.1 Resp. ¶ 129.)

Stmt. ¶ 124.) On examination by Plaintiff's counsel, he testified that "it is possible that the accident caused the loosening, okay, and I feel that the accident was the cause of the loosening, but it could also be a combination of the accident as well as the progression of his problem with his history of nonunions." (Galeno Tr. at 81:11–23.) He agreed the accident was "a contributing factor" in the cervical surgery. (*Id.* at 82:10–17.)

As to the 2024 Accident, Dr. Galeno did not know what injuries it caused, and he testified that the herniations on the February 2024 MRI could have come from that accident or from the degeneration that commonly occurs above and below a fusion, but that if they had resulted from the 2022 Accident, "I would have taken care of them at the time." (Def.'s 56.1 Stmt. ¶¶ 131–33; Galeno Tr. at 74:10–75:21.) More generally, he agreed that any herniation attributed to the 2022 Accident could reflect trauma, degeneration, or both, and that he could not say definitively which. (Galeno Tr. at 75:22–77:5.)

Dr. Galeno's September 9, 2024 narrative report is based on his own notes and operative reports. (Def.'s 56.1 Stmt. ¶ 134.) It concludes that "[a]s a result of his injury, his neck pain and low back pain was significantly exacerbated, which subsequently required surgery," and that he "subsequently had a repair of the nonunion with screw loosening." (Galeno Rpt. at 3–4.) It mentions the 2024 Accident but does not address its effect. (*Id.* at 3.)

Dr. Groth's personal contact with Plaintiff falls into two windows, neither of which includes the period around the 2022 Accident: monthly visits from April to December 2021, and then, beginning August 29, 2024. (Def.'s 56.1 Stmt. ¶ 155; Groth Tr. at 49:5–50:6.) In between, Plaintiff was seen by other practitioners in the practice, whom Dr. Groth does not supervise. (Def.'s 56.1 Stmt. ¶ 143; Groth Tr. at 50:22–51:24.) Dr. Groth first learned of the 2022 Accident on August 29, 2024. (Groth Tr. at 52:17–22.)

Defendant contends that "Dr. Groth cannot assess Buggs' level of disability prior to the 2022 Accident because he was not actively treating him approaching that date." (Def.'s 56.1 Stmt. ¶ 156.) In support, Defendant cites Dr. Groth's deposition testimony that "I can read to you what the nurse practitioners, PAs were saying at those times about how he looks, but I don't have any recollection … [i]t would be totally based on their interpretation." (Groth Tr. at 51.)

Dr. Groth wrote his October 16, 2024 narrative report after examining Plaintiff that day, reviewing his practice's office, procedure, EMG, and MRI records, but not its chiropractic or physical therapy notes. (Def.'s 56.1 Stmt. ¶¶ 165, 167; Groth Tr. at 76:10–25.) When asked at deposition whether he had reviewed reports related to Plaintiff's lumbar surgeries, Dr. Groth responded, "I don't know if I ever saw those. Especially if you are talking about surgical reports, don't think I ever saw them." (Groth Tr. at 34-35.) Dr. Groth was likewise equivocal and unsure when asked whether he had reviewed records from Dr. Galeno's office. (*Compare id.* at 78 ("No, not even sure I had any. Just saying I might have reviewed them. . . . but not sure if I had it at the time I did the report."), *with id.* at 79 ("I likely had those and reviewed those, yes.").)

It is undisputed that Dr. Groth relied, at least in part, on Plaintiff's description of the accident. (Def.'s 56.1 Stmt. ¶ 168.) At his deposition, he testified that his conclusion that the 2022 Accident caused "severe exacerbation" to Plaintiff's spinal condition was "based on patient's increased complaints and also based on the fact he needed subsequent surgery from the loosening of the prior fusion rods." (Groth Tr. at 84.)

Dr. Groth agreed that the post-accident CTs showed no fracture or other sign of acute trauma, that screws can loosen from causes other than trauma, and that Plaintiff's history of nonunion "could have contributed." (Def.'s 56.1 Stmt. ¶¶ 172–74; Groth Tr. at 86:2–87:7.) His conclusion that Plaintiff suffered "multiple new cervical disc herniations" rested on a comparison

of the April 2021 and September 2022 MRI reports, which he testified showed new herniations and annular tears reflecting "acute trauma," although he acknowledged that the 2021 study already showed a bulge at C3-4 and degenerative changes below. (Groth Tr. at 96:24–98:17.) He also agreed that Plaintiff's pre-existing conditions "set the stage" and "contributed to the dis[c] herniations." (Def.'s 56.1 Stmt. ¶ 181; Groth Tr. at 101:14–102:5.) He estimated Plaintiff's disability at 25 to 30 percent before the accident and 50 percent at his deposition. (Groth Tr. at 99:6–20.)

Dr. Groth's report does not mention the 2024 Accident; he testified that from his practice's (not his personal) notes, Plaintiff was "not any worse for the wear" after it, although "it does sound like it was a significant accident." (Def.'s 56.1 Stmt. ¶ 179; Groth Tr. at 93:5–94:7.) The report concludes that the 2022 Accident caused "multiple new cervical disc herniations as well as loosening of hardware in the lumbar spine," requiring surgery on both, and that these are "causally related to this motor vehicle accident." (ECF No. 46-14 ("Groth Rpt.") at 2; Def.'s 56.1 Stmt. ¶ 182.)

Dr. Fischer, an orthopedic spine surgeon, examined Plaintiff twice, reviewed his records, and personally reviewed his imaging. (Def.'s 56.1 Stmt. ¶¶ 183–84; Fischer Rpt. at 21–25.) She concluded that the cervical imaging shows established degeneration before the accident and no acute trauma after it; that the progression on the September 2022 MRI reflects normal aging; and that the cervical fusion treated pre-existing degeneration. (Def.'s 56.1 Stmt. ¶¶ 185–86.) She further concluded that the post-accident lucency at T12 and L1, with no fracture or broken hardware, reflects Plaintiff's long history of failed fusions; that the thoracic herniations reflect wear and tear; and that the February 2023 revision is not causally related to the accident. (*Id.*

¶¶ 187–91.) Plaintiff does not dispute that Dr. Fischer reached these conclusions; he instead points to the contrary opinions of Dr. Galeno and Dr. Groth. (Pl.'s 56.1 Resp. ¶¶ 185–86, 189–91.)

Defendant moves for summary judgment and to exclude the opinions of Dr. Galeno and Dr. Groth under Federal Rule of Evidence 702. (ECF Nos. 44–46.) Defendant does not concede liability but addresses only causation and serious injury. (ECF No. 44 at 10 n.1.) Its position is that, because New York's No-Fault Law bars recovery for non-economic loss absent a "serious injury," N.Y. Ins. Law §§ 5102(d), 5104(a), Plaintiff must present competent, non-conclusory expert evidence both that his injury is serious and that the accident, rather than his pre-existing condition, proximately caused it. (ECF No. 44 at 12–17.)

Defendant makes four arguments. *First*, Dr. Galeno's opinion should be excluded because he conceded that he cannot say definitively whether the screw loosening or the cervical herniations resulted from the accident; because he relied on Plaintiff's unquantified reports of pain and on unmeasured range of motion; and because he did not account for the 2024 Accident. (*Id.* at 19–22.) *Second*, Dr. Groth's opinion should be excluded because his direct treatment did not include the period around the accident; because he did not review Plaintiff's complete history; because his conclusion rests on Plaintiff's subjective reports; and because he disregarded the 2024 Accident. (*Id.* at 22–24.) *Third*, Dr. Fischer's unrebutted opinions establish that Plaintiff's injuries resulted from pre-existing degeneration and nonunion. (*Id.* at 24–25.) And *fourth*, even if admitted, the treating physicians' opinions do not provide objective evidence distinguishing an aggravation of a pre-existing condition from the condition itself. (*Id.* at 25–27.) In reply, Defendant adds that Dr. Groth was disclosed only as a treating physician, not as a retained expert under Rule 26(a)(2)(B), so his testimony must be confined to his own treatment and records. (ECF No. 53 at 6–9.) Plaintiff

opposes, arguing that both physicians' opinions are admissible and that, together with Dr. Fischer's own range-of-motion findings, they raise a triable issue as to exacerbation. (ECF No. 47.)

## II. Discussion

"The FTCA waives the Government's sovereign immunity for state law personal injury claims involving the negligence of its employees." *Moore v. United States*, No. 21-CV-4971 (RER) (PK), 2026 WL 546856, at *17 (E.D.N.Y. Feb. 9, 2026); *see also Orelus v. United States*, No. 23-CV-2451 (JMA)(SIL), 2025 WL 2933026, at *6 (E.D.N.Y. Aug. 13, 2025), *report and recommendation adopted*, No. 23-CV-02451 (JMA) (SIL), 2025 WL 2630039 (E.D.N.Y. Sept. 12, 2025) (discussing federal government immunity and exceptions under FTCA). "Actions sued under the FTCA are to be decided 'in accordance with the law of the place where the act or omission occurred.'" *Haust v. United States*, 953 F. Supp. 2d 353, 358 (N.D.N.Y. 2013) 28 U.S.C. § 1346(b)(1). "The application of § 1346(b)(1) is that '[t]he liability of the federal government under the FTCA is generally determined by state law.'" *Id.* (quoting *Taylor v. United States,* 121 F.3d 86, 89 (2d Cir.1997)). Here, the accident occurred in New York, so New York state law applies.

The Second Circuit has observed that

> New York law requires that plaintiffs … demonstrate that the accident at issue was the cause of the injury. If a defendant moves for summary judgment on the grounds that an accident did not cause the serious injuries in question, that defendant must supply persuasive evidence that the injuries were caused by something else. If the defendant can do so, the burden shifts to the plaintiff, who must come forward with evidence addressing defendant's claimed lack of causation.

*Wirt v. United States*, 732 F. App'x 32, 34–35 (2d Cir. 2018) (internal citations and quotation marks omitted); *see also Comba v. United States*, 535 F. Supp. 3d 97, 111 (E.D.N.Y. 2021) (collecting both New York and federal cases) ("When a defendant submits persuasive evidence that a plaintiff's alleged pain and injuries are related to a pre-existing condition, the plaintiff has

the burden to come forward with evidence addressing the defendant's claimed lack of causation; if the plaintiff fails to meet that burden, the defendant is entitled[] to summary judgment.").

In line with that two-step burden-shifting framework, the Court must first assess whether Defendant has met its burden of indicating *prima facie* that Plaintiff's injuries were caused by something else. *See, e.g.*, *Hicks v. United States*, No. 20-CV-1692 (PKC) (JRC), 2026 WL 2858955, at *9–10 (E.D.N.Y. Sept. 23, 2026) (first evaluating the defendant's prima facie evidence that the plaintiff's injuries were not caused by the accident in question, and then, upon finding the defendant satisfied that burden, turning to the plaintiff's evidence to create a triable issue of fact).

To that end, Defendant points to the report of its expert, Charla Fischer, M.D. (*See* ECF No. 46-15.) In conjunction with her examination of Plaintiff conducted on October 1, 2024, Dr. Fischer compared Plaintiff's MRI and CT results from before and after the subject 2022 Accident. Before the 2022 Accident, the "MRI of the cervical spine performed on April 2, 2021 describes disc bulges C2-3 and C3-4, spondylotic changes C4-5, C5-6 C6-7 and C7-T1"; and the "CT of the cervical spine performed on July 2, 2021 . . . shows C5-6 and C6-7 loss of disc height, endplate sclerosis and anterior and posterior osteophytes, bilateral foraminal stenosis." (*Id.* at 26.) After the 2022 Accident, the "CT of the cervical spine performed on August 30, 2022 shows C5-6 and C6-7 disc degeneration. Thus, no change in the findings from the prior CT in 2021." (*Id.*) Dr. Fischer concedes that the "MRI of the cervical spine performed on September 2, 2022 describes broad based disc degeneration at C3-4 and C4-5, progressed from the prior study"; however, she opines that "[t]his is a normal part of the aging process to see some increased degeneration over time, and this is not a result of the accident." (*Id.*) Informing Dr. Fischer's conclusions is the fact that "[a]fter the subject accident, Mr. Buggs has no evidence of

an acute trauma of the cervical spine after the accident, including no evidence of a fracture or hematoma in the cervical spine." (*Id.*) Indeed, it is undisputed that Plaintiff was taken by ambulance to the hospital after the 2022 Accident and was found by the hospital to have "no neck tenderness and no back tenderness, good pulses in all extremities, no swelling/tenderness in the extremities and no edema." (ECF No. 47-3 at ¶¶ 58, 60.) Given Plaintiff's history of "pre-existing and established disc degeneration" together with the absence of "acute trauma" following the 2022 Accident, Dr. Fischer concluded that Plaintiff's symptoms "are all continued findings of pre-existing chronic degeneration and not a result of the accident." (ECF No. 46-15 at 26–27.)

Dr. Fischer's report establishes prima facie that Plaintiff's injuries were not caused by the 2022 Accident. In *Hicks*, the United States relied on Dr. Fischer's report, which was based primarily on "two key facts"—first, that the plaintiff already had "advanced disc degeneration C5-6 and C6-7" prior to the subject accident, and second, that the plaintiff showed no evidence of acute trauma such as fracture or hematoma. *Hicks*, 2026 WL 2858955, at *8. Judge Chen concluded that "Dr. Fischer's reasoning and conclusions are substantially similar to numerous cases in this Circuit in which courts have found doctors' expert opinions to satisfy the defendants' prima facie burden of showing a lack of causation." *Id.* (collecting cases); *see also, e.g.*, *Smith v. Gray*, No. 19CV2169NGGCLP, 2021 WL 3603588, at *6 (E.D.N.Y. Aug. 13, 2021) (finding defendant satisfied initial burden of showing that the plaintiff's injuries predated the subject accident, based on doctor's opinion that MRIs "show damage consistent with age degeneration or a longstanding injury from an older accident, and that they do not show bleeding, tearing, or bone marrow edema, as one would expect to see in the case of a recent traumatic injury"), *aff'd*, No. 21-2035-CV, 2022 WL 1418973 (2d Cir. May 5, 2022).

Because Defendant has satisfied its prima facie burden, the burden now shifts to Plaintiff, "who must 'come forward with evidence addressing defendant's claimed lack of causation.'" *Wirt*, 732 F. App'x at 35 (quoting *Pommells v. Perez*, 830 N.E.2d 278 (N.Y. 2005)). Plaintiff submits the opinions of two experts, John Galeno, M.D., and Timothy Groth, M.D.

Dr. Galeno saw Plaintiff on September 1, 2022, just days after the 2022 Accident. (*See* ECF No. 46-13.) Dr. Galeno reports that, at that visit, Plaintiff "stated that his low back pain was worse as well as his neck pain" and was "complaining of left leg pain, left-sided low back pain, neck pain, bilateral hand pain." (*Id.* at 1.) Dr. Galeno further reports that a "CT scan of the thoracic spine revealed loosening of the pedicle screws at T12 and L1 from the previous lumbar spine surgery." (*Id.*) Finally, "a physical examination of the neck was performed revealing tenderness and spasm in the paravertebral region of the cervical spine with decreased range of motion and pain on range of motion." (*Id.*) Based on these observations, Dr. Galeno concluded that the 2022 Accident "significantly exacerbated" Plaintiff's neck pain and lower back pain. (*Id.* at 3.)

Defendant took the deposition of Dr. Galeno on June 26, 2025. (*See* ECF No. 46-5.) Following that deposition, both parties agreed that "Dr. Galeno was not aware of what level of disability Buggs had at any particular time and did not know at what point he became not totally disabled." (ECF No. 47-3 at ¶ 114.) It is likewise undisputed that Dr. Galeno did not measure or quantify Buggs' degrees of range of motion because the measurement is "very subjective", provides "no clinical information", "no clinical importance whatsoever" and "is useless." (*Id.* ¶ 116 (quoting Galeno Tr. at 50:18-52:16).) Similarly, although Dr. Galeno's report states that Plaintiff had "decreased" range of motion, it does not explain what that decrease is compared to, nor does it affirmatively state that the decrease was caused by the 2022 Accident. (*See id.* ¶

122.) Indeed, Plaintiff admits that "Dr. Galeno did not compare the previous exam pre-accident to the September 1, 2022 exam to determine if range of motion is worse." (*Id.* ¶ 123.) Finally, Dr. Galeno conceded that Plaintiff had a "pre-existing herniated disc" and could not say definitively whether the 2022 Accident made it "bigger and worse[,]" but he nonetheless opined that "it made the pain worse, made it more symptomatic" even though he could not "tell you size wise." (Galeno Tr. at 63:1–12.)

Dr. Galeno's report and testimony do not rebut Defendant's prima facie showing that the 2022 Accident did not significantly exacerbate Plaintiff's injuries. "Courts in this Circuit routinely preclude a treating physician's opinion testimony as to causation where the physician did not conduct a meaningful 'differential diagnosis' ruling out other possible contributing factors to an injury." *Barth v. United States*, No. 2:22-CV-1155 (NJC) (JMW), 2025 WL 2753721, at *9 (E.D.N.Y. Sept. 29, 2025) (citation modified; internal citation omitted). "In other words, in order to meet the Rule 702(c) requirement that an expert's opinion be based on reliable principles and methods, a treating physician's opinion that something caused a particular injury must be supported by an analysis ruling out other 'obvious alternative causes' and 'provide a reasonable explanation for dismissing specific alternate factors identified by the defendant.'" *Id.* (quoting *Munafo v. Metro. Transp. Auth.*, No. 00-cv-0134, 2003 WL 21799913, at *18 (E.D.N.Y. Jan. 22, 2003)); *see Kang v. Romeo*, No. 18CV4033ARRSMG, 2020 WL 4738947, at *18 (E.D.N.Y. Aug. 14, 2020) (rejecting expert's opinion that the plaintiff's injuries were aggravated by the subject accident as opposed to prior car accidents, because the expert's "only documented justification" was the plaintiff's own subjective report); *contrast Stephens v. Ford Motor Credit Co.*, No. 00-CV-6394 DLI KAM, 2005 WL 2387589, at *5 (E.D.N.Y. Sept. 28, 2005) (finding plaintiff successfully rebutted defendant's prima facie showing, where the

plaintiff's expert "examined plaintiff both before and after the Second Accident, analyzed plaintiff's numerous MRI scans, and administered numerous range of motion tests on plaintiff").[6]

As for Dr. Groth, the Court must first address a threshold issue. Defendant maintains that "[s]ince Dr. Groth is a treating physician, he is precluded from testifying to issues obtained from other physicians' records." (ECF No. 44 at 15.) Plaintiff argues that Dr. Groth is being called as an expert witness, and, "[a]s such, he is qualified to testify and render an opinion outside the four corners of his own personal treatment of Plaintiff." (ECF No. 47 at 10–11.)

"When a treating physician's testimony 'relies upon scientific, technical, or other specialized knowledge,' or upon facts and evidence outside the scope of his own treatment (for example, medical records or reports supplied by another physician), his testimony is considered expert testimony, governed by Fed. R. Evid. 702, which requires disclosure under Rule 26(a)(2)." *Samuels v. City of New York*, No. 22-CV-01904 (JAV) (BCM), 2025 WL 3206488, at *6 (S.D.N.Y. Nov. 14, 2025) (citing *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 2014 WL 5757713, at *4 (S.D.N.Y. Nov. 5, 2014)), *objections overruled*, No. 22-CV-01904 (JAV), 2026 WL 99929 (S.D.N.Y. Jan. 14, 2026). "Rule 26(a)(2) provides for two types of expert disclosure. Under Rule 26(a)(2)(B), if an expert witness has been 'retained or specially employed to provide expert testimony in the case,' the party proposing to call that witness must serve a written report containing" detailed disclosures regarding the witness's opinions, data she considered, exhibits, qualifications, other cases, and compensation. *Id.* (quoting Fed. R. Civ. P.

---

[6] At oral argument, counsel for Plaintiff conceded that Dr. Galeno did not compare pre- and post-Accident exam results. Instead, counsel suggested that Dr. Galeno's opinions are entitled to weight based on his long-standing relationship with Plaintiff, which enabled him to discern subtle differences in Plaintiff's presentation. Needless to say, Rule 702 exists precisely to avoid such unsystematic, unverifiable, "vibes-based" opinions.

26(a)(2)(B)). "In contrast, under Rule 26(a)(2)(C), if the expert witness [h]as not been 'retained or specially employed to provide expert testimony,' the party proposing to call that witness need only serve a disclosure document that states" the subject matter on which the witness will testify and a summary of the opinion. *Id.* (citing Fed. R. Civ. P. 26(a)(2)(C)). "To summarize, 'treating physician testimony can be of three different types: (1) testimony limited to facts acquired and opinions formed during consultation; (2) testimony that also includes reliance on outside sources, such as another doctor's records or opinions or facts acquired as part of litigation; and (3) testimony where circumstances suggest the doctor was retained or specially employed to provide expert testimony.'" *Id.* (quoting *Ali v. Connick*, No. 11CV5297NGGVMS, 2016 WL 3002403, at *9 (E.D.N.Y. May 23, 2016)).

Here, Dr. Groth wrote a brief "narrative" report on October 16, 2024, which was sent to defense counsel on November 4, 2024. (*See* ECF No. 47-2.) The narrative report plainly identifies the subject matter on which Dr. Groth is expected to present evidence, and it presents a summary of the facts and opinions to which he is expected to testify. (*See* ECF No. 46-14.) Defendant appears to concede that this report satisfies the intermediate requirements of Rule 26(a)(2)(C), but nonetheless asserts that "his testimony, if admissible, is limited to only the treatment he provided to Plaintiff." (ECF No. 53 at 4–5.) That is not the law. Dr. Groth's narrative report provides more than enough detail to "permit defendants to prepare their defense" and to "avoid surprise or trial by ambush." *Shell Trademark Mgmt. B.V. v. Individuals & Bus. Entities Identified on Schedule A*, No. 23-CV-7653 (SJB) (LGD), 2026 WL 2874922, at *1 (E.D.N.Y. Sept. 24, 2026) (internal citations omitted). Because Dr. Groth satisfies the requirements of Rule 26(a)(2)(C), he is allowed to opine on matters beyond his direct scope of treatment. *See Goss v. Sealift Inc.*, No. 19 CV 5123 (CLP), 2024 WL 670405, at *19 (E.D.N.Y.

Jan. 17, 2024) (finding treating physician's disclosure satisfied Rule 26(a)(2)(C) and therefore allowing the physician to offer expert opinions based on outside sources).

Unfortunately for Plaintiff, how to categorize Dr. Groth's testimony is an academic point; it does not change the outcome of this case. Even granting that Dr. Groth may rely on sources beyond his own direct observations, his opinions fail for the same reasons as Dr. Galeno's: they are conclusory. "An expert's opinion on causation is 'conclusory' if the expert 'opines, in conclusory fashion, that a plaintiff's injury is 'causally related' to the accident, but offers no explanation or rationale for that opinion.'" *Smith*, 2021 WL 3603588, at *6 (citation modified) (citing *Manzi v. Davey Tree Expert Co.*, 977 F. Supp. 2d 150, 158 (E.D.N.Y. 2013)).

In his narrative report, Dr. Groth opines that Plaintiff's spinal condition "suffered severe exacerbation secondary to" the 2022 Accident. (ECF No. 46-14 at 1.) Specifically, he writes that "[a]s a result of his motor vehicle accident on that date he suffered multiple new cervical disc herniations as well as loosening of hardware in the lumbar spine[,]" concluding that "[i]t is within a degree of medical certainty that the exacerbation of both his cervical and lumbar spine conditions, the required surgery on both his cervical and lumbar spines as well as his dramatically reduced ability to function are causally related to this motor vehicle accident." (*Id.* at 2.) These conclusions appear to be based largely on Plaintiff's own subjective reports of his pain and mobility. (*See id.* at 1.) However, "[w]here a doctor's causation opinion is based solely on the plaintiff's 'subjective reports of her history'—i.e., when symptoms began—the causation conclusion rendered is 'speculative' and 'conjectural.'" *Barth*, 2025 WL 2753721, at *10 (quoting *Johnson v. United States*, No. 21-CV-2851 (MKB), 2024 WL 1246503, at *6 (E.D.N.Y. Jan. 16, 2024)).

Next, Dr. Groth's narrative report documents Plaintiff's cervical and lumbar range of motion, finding both to be below normal across six metrics. (ECF No. 46-14 at 2.) For example, Plaintiff's cervical flexion was 20 degrees compared to a normal target of 50 degrees, and his left lumbar rotation was 15 degrees compared to a normal target of 35 degrees. (*Id.*) Fatally, however, this diagnostic did not compare Plaintiff's performance after the 2022 Accident to his *own* performance prior, so it sheds no light on the pertinent inquiry here: whether Plaintiff's symptoms were significantly exacerbated by the 2022 Accident or were merely the lingering effect of his many prior accidents and subsequent accidents. To reiterate, Plaintiff first injured his lower back in 2007 during an arrest in which he alleged the police used excessive force (ECF No. 47-3 at ¶¶ 4–6); then he fell from the top of a bunk bed in 2018 (*id.* at ¶¶ 10–11); then he fell in the shower in July 2021 (*id.* at ¶ 25); then he was in a car crash on August 29, 2022, which gave rise to this action (*id.* at ¶ 30); then he was involved in another car crash in January 2024 (*id.* at ¶ 74); and *then*, after all that, Dr. Groth conducted a physical examination of Plaintiff in connection with this lawsuit on October 16, 2024 (*id.* at ¶¶ 165, 167).[7] In light of that history, it is hardly surprising that Plaintiff has limited range of motion. The question—which Dr. Groth ignores—is how to disaggregate all the other factors and measure the impact of the 2022 Accident.

Finally, the narrative report compares MRI results from before and after the 2022 Accident. In this regard the narrative report stands on firmer ground. The MRI dated 9/2/2022—i.e., right after the 2022 Accident—revealed "broad-based disc herniation" at C3-4,

[7] Even the above recitation is conservative. Plaintiff may have been involved in yet another motor vehicle accident sometime during or before April 2023 (*see* Def.'s 56.1 Stmt. ¶ 71), but the record is unclear. Similarly, Dr. Fischer's summary of the records also reflects that in April and May 2022, Plaintiff reported neck and back pain after a fall on a front porch and another fall (*see* Fischer Rpt. at 5), but neither party's Rule 56.1 statement mentions these falls.

C4/5, C5-6, C6/7, and C7/T1. (ECF No. 46-14 at 1.) The MRI dated 4/2/2021, by contrast, revealed "minimal" or "moderate" "disc bulge" at those same vertebrae. (*Id.*)

Still, on balance this is too thin a reed. Defendant's expert, Dr. Fischer, opined that the decline observed between the two MRIs can be attributed to "a normal part of the aging process[.]" (ECF No. 46-15 at 26.) Dr. Groth does not account for this possibility at all. He does not opine, for example, that normal wear and tear would not yield such a dramatic change in the span of just a year and a half.[8] This case is analogous to *Pommells v. Perez*, 830 N.E.2d 278, 286–87 (N.Y. 2005). There, the defendant's expert opined that the plaintiff's herniated discs were attributable to a preexisting degenerative disc disease. *Id.* That opinion "shifted to [the] plaintiff the burden of coming forward with evidence indicating a serious injury causally related to the accident[.]" *Id.* Because the plaintiff failed to do so, the Court of Appeals affirmed the lower courts' grant of summary judgment in favor of the defendant. *Id.*; *see also Conde v. United States*, No. 19 CIV. 8506 (NRB), 2021 WL 3604701, at *11 (S.D.N.Y. Aug. 13, 2021) (granting summary judgment in favor of the United States where the plaintiff failed to "substantively respond to Dr. Fischer's diagnosis" that the plaintiff's condition was degenerative). So too here, because Plaintiff has failed to "rule out the alternative diagnosis" that his decline is consistent with the ordinary aging process, summary judgment in favor of Defendant is warranted. *Conde*, 2021 WL 3604701, at *11–12.

At the end of the day, "the district court has a gatekeeping function under Rule 702: it is charged with 'ensuring that an expert's testimony both rests on a reliable foundation and is

---

[8] The Court also notes that the first MRI was taken in April 2021. (ECF No. 47-3 ¶ 19.) In July 2021, Plaintiff slipped in the shower, necessitating a visit to the emergency room. (*Id.* at ¶ 25.) This could have contributed to the deterioration observed in the second MRI. *Cf. Barth*, 2025 WL 2753721, at *9 (noting that "a treating physician's opinion that something caused a particular injury must be supported by an analysis ruling out other 'obvious alternative causes'").

relevant to the task at hand.'" *Barth*, 2025 WL 2753721, at *5 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). That is why the threshold inquiry under Rule 702 is whether the expert's specialized knowledge will be helpful. Fed. R. Evid. 702(a) (requiring that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"). And that is why Plaintiff's experts do not raise a triable issue of fact to defeat summary judgment. Permitting them to testify at trial would not be helpful; they will simply rehash the same conclusory, unsubstantiated opinions they presented in their reports.

**CONCLUSION**

Plaintiff's motion for partial summary judgment (ECF No. 42) is denied and Defendant's motion for summary judgment dismissing the Complaint with prejudice (ECF No. 43) is granted. The Clerk of Court is respectfully directed to close out the case.

Dated: Central Islip, New York
November 5, 2026

**S O O R D E R E D**:

/s/ James M. Wicks
JAMES M. WICKS
United States Magistrate Judge